IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROMONA MANIGAULT,                    )
                                     )
        Plaintiff,                   )
                                     )
        vs.                          )    Civil Action No. 08-1409
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
        Defendant.                   )

## MEMORANDUM OPINION

### I.    INTRODUCTION

Pending before the Court are cross-motions for summary
judgment filed by Plaintiff Romona Manigault and Defendant Michael
J. Astrue, Commissioner of Social Security. Plaintiff seeks review
of final decisions by the Commissioner denying her claim for
supplemental security income benefits ("SSI") under Title XVI of
the Social Security Act, 42 U.S.C. §§ 1381 et seq. For the reasons
discussed below, Defendant's motion is denied and Plaintiff's
motion is granted insofar as she seeks remand for further
consideration.

### II.   BACKGROUND

#### A.    Factual Background

Plaintiff Romona Manigault was born on October 4, 1964.
(Certified Copy of Transcript of Proceedings before the Social
Security Administration, Docket No. 5, "Tr.," at 51.)   Throughout
high school, Plaintiff participated in special education classes,
but graduated at age 17 in June 1982.   (Tr. 95.)   After graduation,

she did not enter the job market, but remained at home with her two daughters.

According to a history she provided to a consulting psychologist in July 2006, Ms. Manigault began experiencing depressive symptoms in 1992 when her brother was murdered in a "bad drug deal" which she witnessed. (Tr. 103.) Episodes of depression would "come and go" during the next few years, but she did not seek nor receive any mental health counseling. As her daughters entered adolescence, they became increasingly difficult to handle and she sought intervention from the Children, Youth and Family ("CYF") agency. When the children were removed from her care, and several more relatives were killed within a short period of time, her depressive symptoms became more evident and she experienced low motivation, isolation, and crying spells.

Ms. Manigault gave birth to a third daughter in 1995 and a son in 2003. (Tr. 52.) In May 2005, CYF removed those children from her custody after she left them home alone. Plaintiff consequently lost welfare benefits and was employed through a temporary placement agency in a series of "office type" jobs. When she completed parenting classes, the children were returned to her in November 2005, and Ms. Manigault again quit working. (Tr. 103.)

B. Procedural Background

On May 31, 2006, Plaintiff protectively applied for supplemental security income benefits, alleging that she became

2

unable to work as of January 1, 2003, due to depression.  (Tr. 62.)
The Social Security Administration ("SSA") denied Plaintiff's
application, concluding she had no physical impairments which would
preclude work at any exertional level and had the mental capacity
to perform routine work in a stable environment, despite her
depression.  (Tr. 40.)

Plaintiff timely requested a hearing before an Administrative
Law Judge ("ALJ"), which was held on December 18, 2007, before
Judge David J. Kozma.  Ms. Manigault, who was represented by
counsel, testified, as did a vocational expert.  (Tr. 27-37.)
Judge Kozma issued his decision on December 21, 2007, again denying
benefits.  (Tr. 9-15.)

The Appeals Council advised Ms. Manigault on August 27, 2008,
that it had chosen not to review this decision, finding no reason
under its rules to do so.  (Tr. 1-3.)  Therefore, the December 21,
2007 opinion became the final decision of the Commissioner for
purposes of review.  42 U.S.C. § 405(h); Rutherford v. Barnhart,
399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530
U.S. 103, 107 (2000).  On October 9, 2008, Plaintiff filed suit in
this Court seeking judicial review of the ALJ's decision.

C.   Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C.
§ 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that
an individual may obtain judicial review of any final decision of

3

the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

## III. STANDARD OF REVIEW

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential,

4

including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV.  ANALYSIS

### A.   The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income, the burden is on the claimant to show that she has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe she is unable to pursue substantial gainful employment[1] currently existing in the national economy.  The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months.  42 U.S.C. § 1382c(a)(3)(C)(I); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000).  The claimant must also show that her income and financial resources are below a certain level.  42 U.S.C. § 1382(a).

---

[1]  According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities."  "Gainful work activity" is the kind of work activity usually done for pay or profit.

5

To determine a claimant's rights to SSI benefits,[2] the ALJ conducts a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, she cannot be considered disabled;

(2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits her ability to do basic work activity, she is not disabled;

(3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity ("RFC")[3] to perform her past relevant work, she is not disabled; and

(5) if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, she is not disabled.

20 C.F.R. § 416.920(a)(4); *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support her position that she is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of

---

[2] The same test is used to determine disability for purposes of receiving either disability insurance benefits or SSI benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both programs.

[3] Briefly stated, residual functional capacity is the most a claimant can do despite her recognized limitations. Social Security Ruling 96-9p defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

6

performing work which is available in the national economy.[4]  Sykes
v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Kozma first concluded
Plaintiff had not engaged in substantial gainful activity since May
31, 2006, the date on which she filed her application for
supplemental security income benefits. (Tr. 11.)  At step two, the
ALJ concluded that looking at the evidence of record "in a light
most favorable" to Ms. Manigault, her severe impairments included
depression and borderline intellectual functioning.

At step three, the ALJ concluded neither of Plaintiff's
impairments, considered singly or in combination, satisfied the
criteria of any relevant Listing.  That is, Plaintiff's depression
did not satisfy Listing 12.04 (affective disorders) and her
impaired intellectual functioning did not satisfy Listing 12.05C or
12.05D.  (Tr. 11.)

At step four, Judge Kozma concluded Ms. Manigault retained the
residual functional capacity "to perform a full range of work at
all exertional levels in a low stress environment." (Tr. 12.)  At
the hearing, the vocational expert, Dr. Charles M. Cohen, had
testified that Plaintiff's past work as a packer was considered

---

[4]  Step three involves a conclusive presumption based on the
listings, therefore, neither party bears the burden of proof at that
stage.  Sykes, 228 F.3d at 263, n.2, *citing* Bowen v. Yuckert, 482 U.S.
137, 146-147 n.5 (1987).

7

light, unskilled work.[5]  When limited to positions which were "low

stress in nature" and did not require working with the public, Dr.

Cohen stated that numerous other light or sedentary jobs such as

cleaner, inspector, or packer existed the economy that such a

claimant could perform, despite her non-exertional limitations.

(Tr. 14, *see also* Tr. 35-36.)  Judge Kozma therefore concluded that

considering her age,[6] high school education, ability to communicate

in English, work experience, and residual functional capacity, Ms.

Manigault had not been under a disability and was not entitled to

benefits at any time between May 31, 2006, and the date of the

ALJ's decision.  (Tr. 14-15.)

B.    The Medical Evidence of Record
      and the ALJ's Treatment Thereof

       1.    *Plaintiff's intellectual functioning and depression:*

Before considering Plaintiff's arguments regarding the ALJ's

alleged errors, we summarize the evidence pertaining to Ms.

Manigault's level of intellectual functioning and depression.  As

---

[5]  "Light work involves lifting no more than 20 pounds at a time
with frequent lifting or carrying of objects weighing up to 10 pounds.
Even though the weight lifted may be very little, a job is in this
category when it requires a good deal of walking or standing, or when
it involves sitting most of the time with some pushing and pulling of
arm or leg controls. To be considered capable of performing a full or
wide range of light work, [the claimant] must have the ability to do
substantially all of these activities."  20 C.F.R. § 416.967(b).  A
person who is able to do light work is also assumed to be able to do
sedentary work unless there are limiting factors such as loss of fine
dexterity or the inability to sit for long periods of time.  Id.

[6]  Plaintiff was 41 years old when she filed for SSI benefits,
making her a "younger" person according to Social Security
regulations.  20 C.F.R. § 416.963(c).

8

reported in her school records, between 1975 and 1981 Plaintiff was given three intelligence tests. The first in April 1975, when she was just over 10 years, revealed a score of 76; in November 1978, at age 14, her score was 66; and at age 16 and a half, her score was again 66. (Tr. 93.) The school records do not provide any background information as to how these tests were administered, the validity of these scores, or any discussion of other evidence of Plaintiff's deficits in adaptive functioning.

There is no direct medical evidence regarding her intellectual functioning or depression from 1978 through 2006. The record indicates that Plaintiff intermittently worked at a series of short-term jobs in 1994-1995, 1998-2001, 2003, 2005, and January through June 2006.[7] (Tr. 58-60; 100.) In her application for supplemental security income benefits, Plaintiff identified only depression and an inability to "stay focused" as the conditions which limited her ability to work. (Tr. 62.) She further stated that she had stopped working in November 2005 "because I got my kids back from CYS" rather than because of depression or any intellectual limitations. (Id.)

On July 21, 2006, as part of the process of applying for Social Security benefits, Plaintiff underwent a clinical evaluation

---

[7] Although Plaintiff was directed to provide a list of all jobs she had held in the 15 years prior to January 1, 2003, the date on which she allegedly became unable to work, she provided information only about the jobs she held between May and November 2005. (See Tr. 81.) Therefore, the Court has relied on employment reporting records at Tr. 58-60.

9

by a psychologist, Dr. John Carosso. (Tr. 101-108.) In addition to reviewing her file, Dr. Carosso conducted a clinical interview and administered three standardized tests. Ms. Manigault reported that she was experiencing depressive symptoms, but denied any history of mental health treatment or medications. Her symptoms included poor motivation, sadness, irritability, inconsistent sleep, and poor appetite; she attributed this depression to the fact that CYF services had removed her children from the home the previous year and to the fact that "family members keep getting killed." (Tr. 103.) She reported that when she had been working, she functioned well, generally got along with her co-workers, and did not have discipline problems. However, she found maintaining employment was "very stressful" due to her mood swings and believed future employment would be uncertain due to increasingly frequent depressive symptoms which resulted in poor motivation at times. (Tr. 104.)

In the mental status portion of Dr. Carosso's examination, he reported Ms. Manigault was alert, fully oriented and well-groomed; she was engaged and cooperative during the evaluation process although frequently distracted by her three year old son whom she had brought to the interview. Her responses tended to be brief and limited in content but her thought process was logical and coherent. She seemed to have fair insight but Dr. Carosso believed "her judgment can be poor at times." (Tr. 104-105.)

10

On the Sheehan Work Disability Evaluation Scale, Plaintiff reported she considered herself extremely impaired in her ability to concentrate and described herself as highly irritable. However, her ability to perform physical work and get along with others was only mildly impaired. On the Mini-Mental State Exam,[8] Ms. Manigault had difficulty recalling one of three words, could not concentrate well enough to spell the word "world" backwards,[9] made some errors in repeating a brief statement, and was unable to copy a picture of two interlocking pentagons. (Tr. 105-106.) However, she could mentally multiply numbers from 2 times 3 to 2 times 24, interpret proverbs, and respond to questions designed to test her judgment, common sense, general knowledge and ability to budget.[10]

On the Wechsler Adult Intelligence test - third edition ("WAIS"), Ms. Manigault scored 64 on the full scale IQ, 68 on the verbal scale, and 64 on the performance scale, all indicative of mild mental retardation. (Tr. 102.) Dr. Carosso noted that her attention and concentration during the test were negatively

---

[8] This multi-part exam included tests of orientation, immediate and short-term memory, concentration, aphasic conditions (the ability to identify objects, repeat a phrase, read, and complete the instruction to close eyes), follow three-step directions, write a complete sentence, and copy a drawing. (Tr. 105-106.)

[9] Dr. Carosso attributed this inability in part to disruptive activity of Plaintiff's son during this portion of the interview. (Tr. 105.)

[10] Dr. Carosso reported Plaintiff's responses in these categories but did not evaluate them other than to note that the ability to multiply up to 2 x 24 indicated an 84% chance of having an IQ of 85 or higher. (Tr. 106.)

11

impacted by the presence of her son. She also appeared to demonstrate little effort, "not uncommonly gave up easily when uncertain of the correct response," appeared frustrated with the more difficult tasks and, despite prompting, was reluctant to maintain effort. She also seemed "somewhat annoyed" with the test.

(Tr. 106.) In evaluating the test results, Dr. Carosso noted:

> Although the subtests were administered according to standardized test protocol. . . . these results should be interpreted with caution given her limited attention and focus and propensity for frustration. Nonetheless, her performance in that regard is clearly indicative of a low frustrational tolerance that likely affects daily functioning. . . . While her intellectual functioning is sub par, her scores on the WAIS were affected by her son's presence and, therefore, results indicating Mild Mental Retardation are likely a low estimate with intellectual functioning estimated to be more closely within the Borderline range.

(Tr. 106-107.)

Dr. Carosso also concluded that Ms. Manigault could have difficulty retaining and following through with directions; maintaining focus and with tasks requiring sustained mental effort due to her propensity for becoming easily frustrated; interacting appropriately with co-workers due to her depression and irritability; and tolerating stress and pressures associated with day-to-day activities. (Tr. 107.) Dr. Carosso diagnosed Ms. Manigault with late onset dysthymic disorder[11] and borderline

---

[11] Dysthymic disorder is a chronic form of depression characterized by moods that are consistently low, but not as extreme as in other types of depression. The main symptom is a long-standing low, dark, or sad mood nearly every day; other symptoms can include poor appetite or overeating, insomnia or hypersomnia, low energy or

12

intellectual functioning. He concluded her Global Assessment of Functioning ("GAF") score was currently 60 and at a high of 65 during the previous year.[12]

A state-agency medical consultant, Roger Glover, Ph.D., completed a review of Plaintiff's file on August 16, 2006. Dr. Glover concluded Plaintiff would have no limitations in her ability to perform most work-related activities such as understanding, remembering, and carrying out very short and simple instructions, sustaining an ordinary work routine, working with others without being distracted by them or vice versa, making simple work-related decisions, asking simple questions, taking appropriate precautions in response to normal hazards, and traveling in unfamiliar places

_____

fatigue, low self-esteem, poor concentration, and/or feelings of hopelessness. *See* the medical encyclopedia at the National Institute of Medicine's on-line website, www.nlm.nih.gov/medlineplus (last visited April 24, 2009), "Medline Plus."

[12] The GAF scale assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable care for themselves. Drejka v. Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n2 (D. Del. Apr. 18, 2002). A GAF score between 51 and 60 reflects "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social [or] occupational . . . functioning (e.g., few friends, conflicts with peers or co-workers)." *See* the on-line version of the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV"), Multiaxial Assessment, American Psychiatric Association (2002), at www.lexis.com., last visited April 24, 2009. A score between 61 and 70 reflects "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Id. Neither Social Security regulations nor case law requires an ALJ to determine a claimant's disability based solely on her GAF score. *See* Ramos v. Barnhart, CA No. 06-1457, 2007 U.S. Dist. LEXIS 23561, *33-*34 (E.D. Pa. Mar. 30, 2007), and cases cited therein.

13

or using public transportation. She would have only moderate limitations in her ability to understand, remember and carry out detailed instructions, maintain concentration for extended periods, perform on a schedule with acceptable attendance and punctuality, complete a normal workday and work week, interact appropriately with the general public, accept instruction from and respond appropriately to supervisors, maintain socially appropriate behavior, respond appropriately to changes in the work setting and set realistic goals or make plans independently of others. In sum, Dr. Glover found Ms. Manigault would be "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment[s]," i.e., borderline intellectual functioning and dysthymic disorder. (Tr. 109-111.)

In considering Plaintiff's impairments against the criteria of the relative Listings, 12.04, affective disorder, and 12.05, mental retardation, Dr. Glover concluded Ms. Manigault would have no more than mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and that there had been no reported episodes of decompensation, each of extended duration.[13]

---

[13] Listing 12.04 sets out three categories which measure the severity and effects of the claimant's impairment, commonly referred to as the A, B, and C criteria. The "A criteria" require the claimant to show the medically documented persistence of one or more depressive, manic, bi-polar or anxiety-related syndromes, marked by combinations of particular traits. To satisfy the "B criteria," the claimant's mental impairment must be of such severity that it results in at least two of the following: "marked" (i.e., "more than moderate

14

(Tr. 112-125.)

At the hearing, Ms. Manigault reported she had received mental health treatment at "Mercy Behavioral," but failed to comply with the program requirements and missed many appointments. (Tr. 29-30.) She then participated in a program called "Family Links" which provided weekly sessions with a psychiatrist, but dropped out after six months when she "started not getting along with the other girls." (Tr. 30.) At the time of the hearing, Ms. Manigault had just entered a drug and alcohol treatment program through a facility called "Hosanna House." (Tr. 30-31.) No medical records

---

but less than extreme") restrictions in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation (i.e., "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships or maintaining concentration, persistence or pace"), each of extended duration. To satisfy the "C criteria," the claimant must present medical evidence that her affective disorder has lasted at least two years and has resulted in "more than a minimal limitation of ability to do basic work activities." The symptoms or signs must be currently attenuated by medication or psychosocial support. The C criteria of Listing 12.04 also require the claimant to show one of the following: repeated episodes of decompensation, each of extended duration; a residual disease process resulting in such marginal adjustment that even minimal increases in mental demands or change in the environment would be predicted to cause the individual to decompensate; or a current history of one or more years' inability to function outside a highly supportive living arrangement and an indication of the continued need for such an arrangement.

To meet Listing 12.04, the claimant must satisfy the A criteria plus two of the four B criteria, or, alternatively, satisfy the C criteria. See Listing 12.00C, citing 20 C.F.R. § 416.920a.

The criteria of Listing 12.04B are also used in determining if a claimant satisfies Listing 12.05D, one of the four means by which a claimant can establish that his or her mental retardation is presumptively disabling.

15

from any of these programs appears in the record and it is not clear when this limited treatment occurred.

2. *The ALJ's consideration of the evidence:* In his decision, Judge Kozma made the following findings with regard to Plaintiff's depression:

- At step two of his analysis, when considering the evidence "in a light most favorable" to Ms. Manigault, Judge Kozma concluded her depression was severe despite the fact that she "has never received any professional mental health treatment, takes no medication and reports only mild depressive symptoms." (Tr. 11, emphasis in original.)

- Ms. Manigault "barely" met the A criteria of Listing 12.04, i.e., the medically documented persistence of one or more depressive syndromes, given that she reported only sleep disturbances, poor appetite and low motivation. However, she did not satisfy any of the B or C criteria and had a GAF between 60 and 65, indicative of no more than mild to moderate depressive symptoms. (Tr. 11.)

- Although Plaintiff testified that she hears voices and cannot get along with others, she failed to complete any mental health treatment program. (Tr. 13.)

- After an accurate summary of Dr. Carosso's findings from the mental status exam conducted on July 21, 2006, the ALJ found his conclusions regarding Plaintiff's ability to retain and follow through on directions, perform tasks requiring sustained mental effort, tolerate daily stress, and interact with co-workers to be "contrary to the evidence of record and inconsistent with his own mental status examination" as well as with a GAF score which indicated only mild impairment. (Tr. 13.)

- Judge Kozma also found Dr. Glover's conclusion that Ms. Manigault would experience moderate limitations in most work-related abilities to be an exaggeration of her limitations "in light of the fact that she reports only mild depressive symptoms, takes no medication, and has never received professional mental health treatment." Moreover, Dr. Glover's conclusion was also inconsistent

16

with findings elsewhere in his report that Ms. Manigault was only mildly limited in her ability to perform ordinary activities of daily living and moderately limited in the areas of social functioning and concentration. (Tr. 13-14.)

With regard to Plaintiff's level of intellectual functioning,

Judge Kozma concluded:

- Plaintiff's severe impairments included borderline intellectual functioning. (Tr. 11.)

- Because the record included evidence of a WAIS full scale score of 64, he was required to consider Listings 12.05C and Listing 12.05D.[14] (Tr. 11.)

- With regard to Listing 12.05C, Plaintiff has no physical impairment and "her depression fails to impose additional and significant limitations on her ability to function." Thus, her borderline intellectual functioning does not satisfy Listing 12.05C. (Tr. 11.)

C. Plaintiff's Arguments

Plaintiff raises three inter-related arguments in the brief in support of her motion for summary judgment. (Plaintiff's Brief, Doc. No. 8, "Plf.'s Brief.") First, she argues that the ALJ erred by incorrectly construing an IQ score of 64 as constituting borderline intellectual functioning rather than mental retardation. As a consequence, he erred in his conclusion that Plaintiff did not satisfy Listing 12.05, an error which is compounded by the fact that he did not provide any adequate reasoning or analysis as to how he arrived at this conclusion. Finally, the ALJ's description of Ms. Manigault's residual functional capacity included only a

---

[14] Plaintiff raises no argument with regard to Listing 12.05D, therefore, the Court will omit any detailed discussion thereof.

17

restriction to low stress work which is related to her depression, not her intellectual deficits.

The first two arguments can be addressed simultaneously in the context of considering the criteria of Listing 12.05 which begins with an introductory paragraph setting forth the diagnostic description for mental retardation. According to this so-called "capsule definition," mental retardation refers to "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.05. The Listing also contains four sets of criteria, A through D; if the claimant's level of mental retardation satisfies any one of those four sets of criteria, the ALJ should conclude at step three that the impairment satisfies the Listing.

As succinctly stated by the United States Court of Appeals for the Third Circuit, a claimant satisfies the three-prong test of Listing 12.05C when she "i) [has] a valid verbal, performance or full scale IQ of 60 through 70, ii) [has] a physical or other mental impairment imposing additional and significant work-related limitations of function, and iii) [can] show the mental retardation was initially manifested during the developmental period (before age 22)." Markle v. Barnhart, 324 F.3d 182, 187 (3d Cir. 2003). Only one score within the 60 to 70 range is necessary to satisfy

18

the first part of this test. *See* <u>Burns v. Barnhart</u>, 312 F.3d 113, 125, n.6 (3d Cir. 2002), noting that the claimant receives the "benefit of the doubt" inasmuch as the lowest score on a multi-part IQ test is the score used in the rest of the analysis. The regulations also state that since IQ test scores are "only part of the overall assessment," they should be accompanied by a narrative report which indicates whether the scores "are considered valid and consistent with the [claimant's] developmental history and the degree of functional limitation." Listing 12.00(D)(6)(a).

The second prong of Listing 12.05C requires evidence of impairment(s) which impose "additional and significant work-related limitations of function." This prong is satisfied if the ALJ identifies one or more severe impairments in addition to the claimant's mental impairment at step two of his analysis. In August 2000, the SSA clarified that it always had intended the phrase "to mean that the other impairment is a 'severe' impairment as defined in §§ 404.1520(c) and 416.920(c)." *See* <u>Markle</u>, 324 F.3d at 188, *quoting* "Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury," 65 Fed. Reg. 50746, 50772 (Aug. 21, 2000).

The third prong of Listing 12.05C is satisfied when medical and other records dating from before the claimant was age 22 show evidence of mental retardation. This documentation can include school records reflecting IQ test scores or a history of special

19

education classes. *See*, e.g., Christner v. Astrue, 498 F.3d 790, 793 (8th Cir. 2007) (claimant who dropped out of school at a low grade level despite participation in special education classes "likely" met the burden of establishing onset before age 22); Maresh v. Barnhart, 438 F.3d 897, 900 (8th Cir. 2006) (struggling in special education classes, having trouble with reading, writing and math, and dropping out of school in the ninth grade constituted evidence of mental retardation prior to age 22); and Blackwell v. Comm'r of Soc. Sec., CA No. 08-374, 2008 U.S. Dist. LEXIS 90303 (W.D. Pa. Nov. 6, 2008) (claimant dropped out at the middle school level, required "6 or 7 years" and the assistance of a tutor to complete a GED, and presented evidence of an IQ score of 70 when he was 11 years old.) Other evidence showing the onset of mental retardation prior to age 22 includes qualification for SSI benefits as a child based on that impairment. *See* Elder v. Comm'r of Soc. Sec., CA No. 07-59, 2008 U.S. Dist. LEXIS 60929, *25-*26 (W.D. Pa. July 31, 2008).

We agree with Plaintiff that the ALJ's analysis of Listing 12.05C is superficial at best. However, this is not a case in which there is an extensive medical history with differing opinions about the severity of the claimant's condition. The only evidence regarding Plaintiff's level of mental functioning is (1) her IQ scores from school records and (2) Dr. Carosso's test results from July 2006.

On the surface, it appears Plaintiff satisfies all three criteria of Listing 12.05C. That is, the results of the IQ tests administered by Dr. Carosso reflected scores between 64 and 68, indicative of mild mental retardation. (Tr. 102.) Second, the ALJ found that Plaintiff had a second severe impairment, i.e., depression, thus satisfying the second criterion. Ms. Manigault's school records reflect IQ scores between 60 and 70 in tests administered when she was 14 and 16, thus satisfying the third criterion. However, we conclude the ALJ did not err in adopting Dr. Carosso's opinion that Plaintiff demonstrated borderline intellectual functioning rather than mild mental retardation.

As noted above, Dr. Carosso concluded that due to distractions caused by Ms. Manigault's child while she was trying to complete the WAIS tests, her tendency to give up easily when uncertain of the correct response to a question, and her reluctance to maintain effort, the test results should be "interpreted with caution" and her intellectual functioning was more likely to be in the borderline range than mild mental retardation. (Tr. 106-107.) He did not, however, clearly state that the test results were valid or invalid.

The regulations and case law are clear that an ALJ may reject the results of an IQ test which are shown to be "invalid." In arriving at his determination of whether an IQ score is valid, i.e., the score is "an accurate reflection of [a claimant's]

21

intellectual capabilities," the ALJ is to consider the entire record before him. Lax v. Astrue, 489 F.3d 1080, 1087 (10th Cir. 2007); Markle, 324 F.3d at 186. Test results may be considered invalid where there is evidence that the claimant was malingering or deliberately attempting to distort the results during the test administration or when the conditions under which the test was given could have negatively affected the scores. *See*, e.g., Clay v. Barnhart, 417 F.3d 922, 930 (8th Cir. 2005) (psychologist rejected the results of the IQ test he had administered due to his conviction that the claimant was malingering); Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1989) (failure to eat for two days and drinking extensively before the IQ test may have contributed to low scores inconsistent with claimant's ability to perform his work assignments, understand and follow directions, relate to coworkers, and withstand the stress of daily work); and Lax, 489 F.3d at 1087 (claimant's "inadequate" effort and inconsistent performance on IQ test resulted in scores which appeared to be an "under estimation of his cognitive abilities.")   Similarly, test results may be deemed invalid where the IQ scores are inconsistent with the claimant's prior educational or work history, daily activities, behavior, or other aspects of his or her life.

Although neither Dr. Carosso nor Judge Kozma used the term "invalid" in considering Plaintiff's IQ scores, the fact that Dr. Carosso – a trained psychologist who recognized that scores between

22

61 and 70 generally reflect mild mental retardation rather than borderline intellectual functioning[15] - diagnosed Ms. Manigault with the latter despite her test results means that he implicitly found the scores invalid; otherwise, he would have diagnosed her with mild mental retardation with the caveat that the scores should be interpreted with caution. The reasons he gave for raising the red flag about interpreting her scores are clear from the face of his report - her distractions, poor effort, and low frustration tolerance.

The facts of Lax v. Astrue are quite similar to those herein. There, the psychologist "explicitly questioned" the validity of the claimant's IQ scores, commenting that his "effort was minimal," his responses "were vague but coherent," information he provided "appeared unreliable," and his scores appeared "to be an under estimation of his cognitive abilities." Lax, 489 F.3d at 1087. As the court pointed out in that case, such comments "provide substantial evidence to support the ALJ's determination that Lax's IQ scores were not reliable." Id.

Although stated in a very brief fashion, Judge Kozma pointed to three factors in the record which contradict the severity of Plaintiff's mental impairments - the fact that she graduated from high school, had worked as a packer, and raised her children, all

---

[15] Standardized test scores between 71 and 84 are indicative of "borderline intellectual functioning." Boyd v. Apfel, 239 F.3d 698, 702, n.5 (5th Cir. Tex. 2001), citing DSM-IV, p. 45.

23

without indication of marked limitations in any area. (Tr. 12.) While we do not disagree with the ALJ's ultimate conclusion, a more detailed analysis would have been helpful to the Court, particularly with regard to his determination as to the validity of Plaintiff's IQ scores. *See* Burnett v. Commissioner of SSA, 220 F.3d 112 (3d Cir. 2000) (where an ALJ's decision fails to address significant medical evidence or explain his reasoning, the decision is "beyond meaningful judicial review" by the district court on appeal.)

Finally, we consider Plaintiff's argument that the ALJ's RFC analysis was inadequate because it did not include any limitations resulting from her borderline intelligence. (Plf.'s Brief at 9.) At the hearing, the ALJ posed a single question to the vocational expert, that is:

> For purposes of this hypothetical question, I would like you to assume the age is 43, high school, and I'd also like you to hypothetically assume there would be a residual functional capacity. There would be no physical restrictions. From a non-exertional, it would have to be low stress in nature, not working with the public. Any jobs fall into that category, sir?

(Tr. 38-39.)

The vocational expert responded that there would be light cleaning jobs, light packing jobs, and light inspector jobs.[16] (Tr.

---

[16] Since no job identification numbers were provided, it is impossible to ascertain exactly which jobs the VE had in mind, but it appears, based on the Court's review of the DOT, that the job of cleaner (housekeeping) and inspector/hand packager, 323.687-014 and 559.687-074, respectively, are both "light" jobs with a specific vocational preparation ("SVP") rating of 2. *See* Dictionary of

24

39.) Neither the ALJ nor Plaintiff's attorney asked any follow-up questions which explicitly took into account Plaintiff's borderline intellectual functioning.

Under Third Circuit precedent, a claimant's limited intellectual functioning is to be considered when determining his or her residual functional capacity. In Burns v. Barnhart, *supra*, intelligence tests indicated that the plaintiff functioned at the borderline level. The hypothetical question to the vocational expert included a restriction to "no more than simple repetitive one, two-step tasks." Id., 312 F.3d at 122. The ALJ relied on the vocational expert's response that a number of jobs existed in the local and national economies which satisfied this restriction to conclude at step five of his analysis that Burns was not disabled. The Court of Appeals found the ALJ's reliance improper because the

Occupational Titles, revised 4th edition, provided by the U.S. Department of Labor at www.occupationalinfo.org (last visited April 28, 2009.) SVP ratings of 1 and 2 are associated with unskilled jobs for which the required training consists of "anything beyond short demonstration up to and including 1 month." *See* Social Security Ruling 00-4p, "Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions," stating "unskilled work corresponds to an SVP of 1-2." However, this Court may not "rectify errors, omissions or gaps [in the ALJ's decision] by supplying additional findings from its own independent analysis of portions of the record which were not mentioned or discussed by the ALJ." Cefalu v. Barnhart, 387 F. Supp.2d 486, 491 (W.D. Pa. 2005) (Hardiman, J.), *citing* SEC v. Chenery Corp., 318 U.S. 80, 87 (1943), which requires a reviewing court to limit its consideration to what is plain on the face of the administrative agency's decision, i.e., the court may not "read into" the decision reasoning or conclusions which are not clearly stated. Therefore, we cannot independently conclude that the jobs described by the VE were unskilled jobs that Plaintiff could perform despite her intellectual limitations.

phrase he used did not "specifically convey" all the intellectual deficiencies which had been described in a psychologist's report. The Court found instead, that the phrase used by the ALJ "could refer to a host of physical and mental limitations, such as a person's mechanical or small motor skills, his lack of initiative or creativity, or a fear of, or unwillingness to take on, unfamiliar tasks."

Similarly, we find that the description limiting possible jobs Ms. Manigault could perform to those which were "low stress in nature," and did not require "working with the public," does not specifically convey Plaintiff's intellectual limitations established both by the objective tests administered by Dr. Carosso and by his conclusions based on his professional observation of Ms. Manigault, as well as the conclusions of Dr. Glover's file review.

We recognize that the ALJ explained that he rejected the conclusions of both physicians because they exaggerated Ms. Manigault's limitations with regard to her ability to perform work-like functions and because Dr. Carosso's conclusions were "contrary to the evidence of record and inconsistent with his own mental status examination." (Tr. 13.) While we may agree with this conclusion as it pertains to the doctors' findings as to the severity of Plaintiff's depression, there is no evidence that either physician exaggerated the extent of Plaintiff's limitations due to borderline intellect. For example, Dr. Carosso concluded

26

that Plaintiff "would likely experience difficulty retaining and following through with directives as was evidenced by her performance during the current evaluation." (Tr. 107.) He added that "depressive symptoms could also affect her ability to maintain focus." (Id.) Read together, these statements imply that limitations arise from her intellectual capacity as well as her depression. Similarly, he noted that Plaintiff might have "difficulty with tasks requiring sustained mental effort due to her propensity for becoming easily frustrated as was evidenced during the intellectual assessment" (id.), again implying limitations due to intellect rather than depression.

Despite the ALJ's statement that Dr. Carosso's findings were inconsistent with other evidence of record, he does not identify the evidence on which he relies to refute the psychologist's opinions. If the ALJ rejects a physician's opinion,[17] it cannot be "for no reason or for the wrong reason." Morales, 225 F.3d at 317. Moreover, ALJ "may not make speculative inferences from medical reports," and may reject the opinion "outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." Id. (internal

---

[17] The Court recognizes that this rule generally applies to the opinion of a treating physician, particularly where the opinion reflects an expert judgment based on observation of the claimant over a long period of time. Morales, 225 F.3d at 317. Here, however, there are no first-hand medical observations other than those of Dr. Carosso. Thus, we find that under the facts of this case, Dr. Carosso's conclusions regarding Plaintiff's mental capacity are unrefuted by other medical evidence.

quotes and citations omitted.)

In light of Dr. Carosso's conclusions regarding Plaintiff's limited intellectual capacity, which are unrefuted by other medical evidence of record, we find that the ALJ should have included in his hypothetical question a phrase which properly reflected her borderline intellectual functioning. In the absence of such a restriction, the VE's response that other jobs existed which Plaintiff could perform cannot be considered substantial evidence on which the ALJ could rely in reaching his conclusion that Plaintiff was not disabled.

## V.    FURTHER PROCEEDINGS

Under 42 U.S.C. § 405(g), a district court may, at its discretion, affirm, modify or reverse the Secretary's final decision with or without remand for additional hearings. However, the reviewing court may award benefits "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits." Krizon v. Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), *quoting* Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir. 1984).

Here, we are not convinced that the ALJ's ultimate conclusions were incorrect; in fact, upon remand, he may reach the same conclusions. Contrary to Plaintiff's argument, this case need not be remanded because the ALJ adopted the examining psychologist's

28

conclusion that Plaintiff's intellectual level was more likely at the borderline level rather than mild mental retardation because the ALJ relied on evidence which was well explained in Dr. Carosso's report. However, the ALJ's apparent consolidation of restrictions arising from Plaintiff's depression with those which the psychologist seems to attribute to her intellectual limitations, coupled with the ALJ's failure to include in his RFC any intellectual limitations whatsoever despite his finding of borderline intelligence, makes his reliance on the vocational expert's testimony questionable. We therefore find that this case must be remanded for further consideration consistent with the analysis herein.

An appropriate order follows.

April __30__, 2009

_William L. Standish_
William L. Standish
United States District Judge